Good morning. May it please the Court. My name is Manuel Corrales. I represent the plaintiff, California Valley Miwok Tribe, and I would like to have 15 minutes and reserve 5 minutes for rebuttal, if I may. You may, but you'll have to keep track of your time as you do that. Yes, Your Honor. Thank you. I'd like to, as the Court knows, we hear about the Washburn December 2015 decision. And what I'd like to focus on today, I set out a lot of issues in my brief, but what I want to focus on today is his improper historical analysis concerning the membership, quote, non-recognition of the general counsel, the governing body of the tribe. Counsel, before you get to that or as you're discussing it, I'd like you to address the question whether this issue, this same issue, was in fact necessarily and actually litigated in Miwok I and Miwok II. Because the entire basis of the 2004 letter that was involved in those earlier appeals was that the Constitution would not be accepted because it did not represent the will of the majority of the tribe. And there was an extensive discussion of who else either was or probably or maybe was a tribal member. And it rejected the Burley faction's statement of who was a tribal member. So why are we here again litigating that same issue? Yes, Your Honor. Your Honor, you're talking about a 2004 letter from the BIA is what the Court is talking about? Which was part of what was challenged in Miwok I and Miwok II. And then there was the 2005 decision as well. 2005 decision. Yes, yes. I think that's the Olson decision. What happened was this was appealed to the IBIA. And in 2010, the IBIA referred the matter of membership to the Secretary, the Assistant Secretary of Interior. And Echo Hawk, the Assistant Secretary Echo Hawk, rendered his decision in 2011, basically finding that the general counsel was the valid governing body of the tribe and that the tribe consists of five members. So we are here because Dixie, Yakima Dixie, challenged that. And he challenged that by filing a lawsuit in the district court in the District of Columbia. And that was appealed. I'm aware of that. But I guess the bottom line for me is whether the tribe consists of more than five members, it seems to me, was litigated in Miwok I and II and decided in those cases. Yes, Your Honor. And so aren't we done with the question of whether the tribe consists of five members or not? No, we're not, Your Honor. I think that the issue of whether the Burleys and the Dixies, well, let me back up. First of all, the issue of whether or not that was necessarily decided, that is, limited to five members, was rejected by Miwok III. Well, that's one reading of it. It seems to me that it may be dicta, but that's another question. The district court, Judge Shub said it wasn't expansive enough. I don't think it's dicta. I think she specifically stated the only issue before the court in Miwok I and II was whether the Secretary had the authority to refuse to approve a constitution submitted under the IRA, that is, 476. Right, but the only reason it was not approved was that it didn't represent a majority of the members because there were more than five members, because the constitution was submitted by three members, which would be a majority of five. And yes, that was the ultimate question, but the whole point was that it would be accepted if there were five members and rejected if there were more than five. Yes, Your Honor. So that was a necessary underpinning to Miwok I and II, wasn't it? I can understand that. No, it wasn't because the issue there was whether the tribe could be forced to reorganize under the IRA. And under the IRA statute, it talks about the whole community, the whole tribal community. I think language is talked about there. But what constitutes the majority of the tribe is whether or not there are these potential members who should be included as the majority or the actual enrolled members in 1998. Yes, Your Honor. Counsel, one point that I'd like you to address today is if I were to agree with you that issue preclusion does not — is not appropriate in this case, why shouldn't we in any case affirm on the ground that the Secretary's decision was not arbitrary and capricious? Yes, Your Honor. And that was my point. I think Washburn in the 2015 decision ignored this historical analysis in the administration record. What he did observe and what I think is pretty compelling is that Jeff Davis in 1935 was approached by the BIA to vote for the IRA. He alone was eligible to vote. There is this tabulation. There was a referendum that was sent out by the DOA in January of 1935 saying, go out and get eligible votes of these rancheras to vote for the IRA. And so the tabulation was done, and that tabulation was, I believe, in June of 1935, if I'm not mistaken. Sometime in June of — I'm sorry, January of 1935. And in this tabulation, the BIA says there are these rancheras in California. They're unorganized, in addition to others. They were tabulating in accordance with this referendum. And they listed the tribe as having 16, a population of 16. But they listed other rancheras as well. And so when the June 14, 1935 letter went out and listed Jeff Davis as the only eligible person to vote, they had this other tabulation that said, well, there are 16 people that are populated for the ranchera. But there were others. There were others. If you look at the ER-44, the record, there's — this letter says, the Stewart Point Ranchera had a total population of 103, according to the tabulation, but there were only 70 eligible voters. The Rumsey Ranchera and so forth. So in the Washburn decision, there's a statement, I conclude that the tribe's membership is not properly limited to Mr. Dixie and the Burley family. Your contention is that's arbitrary and capricious, correct? Yes. So can you tell me exactly why that conclusion is arbitrary and capricious on the state of the evidence before the Secretary? Yes. Again, it has to do with Dixie's power to enroll and organize the tribe in 1998. He enrolled the Burleys in August of 1998, and so they, together with him and his brother Dixie, became enrolled members — not enrolled, but members of the tribe. The question is whether or not these descendants of the 1915 census that are these 200-so potential members, punitive members, are also members. And the answer is no. In fact, Washburn concedes that. He says, but ultimately, they can be members to participate in the reorganization of the tribe. Then he goes even further and says they are actual members. That's confusing. The actual members are those that were enrolled, because Dixie alone had that authority in 1998, just like Jeff Davis had that authority in 1935 to the exclusion of all of the other descendants of the 1915 census. The same with these other rancheras, Susanville, Rumsey, Stewarts. Their population was 24, but 9 were eligible to vote, 20, but 11 were eligible to vote, and so forth. So the policy that the BIA had was, who are the members that have this power and authority to enroll and to vote and to organize the tribe? Only those that resided on the rancheras. And it was Dixie alone who ultimately — he was the — he claimed and Washburn conceded this. He was the dwindling tribe. He was the remnant, the last of the Mohicans, so to speak. He was the only one that was residing on the ranchera who was authorized and empowered to enroll members. And he did with the Burleys. And so from there, the issue was whether or not the BIA could force the tribe to reorganize under the IRA. And the only reason they were trying to do that is because of this leadership dispute. We see that in the IBIA decision of 2010. That was the reason why the BIA decided that they were going to call this meeting and have all these participants, these putative members, participate in the reorganization of the tribe. Because according to them, they said, in order for us to have — in order for the tribe to have this government-to-government relationship, we first have to resolve this leadership dispute. And it's necessary for us to first reorganize the tribe under the IRA. That was wrong. And so Washburn's decision kind of keeps going with that mental thinking. Echo Hawk's decision was more correct. You don't have to go through that. There's no law forcing the tribe to reorganize. Although that was reversed, correct? That was vacated, Your Honor. Vacated. Yes, it was vacated.  Yes, it was vacated, rescinded, and replaced. But I think you're — well, okay, I won't get into that. But what Washburn was told to do by Rothstein, he was told to go back and first — she said Echo Hawk assumed too much. He assumed that the tribe was authorized or — yeah, authorized. He assumed that there were five members. And she said go back and first determine whether it was. Find the facts in the record to justify these conclusions. Washburn didn't do that. Instead, he comes up with this idea about these potential residents or punitive members who were outside, never resided on the lot. They were eligible to vote in the future. And because of that, they must be members. And therefore, there's more than five members of the tribe. That is wrong. That's inconsistent with the historical facts of the case in the administrative record that says that the BIA consistently considered those who resided on the rancheras, these unorganized rancheras, to be the only members, the only members of that tribe, the only persons who had authority to organize the tribe. So that's why Washburn's decision is arbitrary and capricious. It's inconsistent with the record. It's inconsistent with what the BIA's policy was throughout these years. And then we have to look at Mabel Dixie. What happened with her? She was approached by the BIA in 1966 and said you are the only one that's authorized to vote for termination. Later we get a letter from Sheldon, Lenny Sheldon, who was the band leader's daughter back in 1915 when she's included in the 1915 census. She says, wait a minute, me and my brothers and my granddaughter, we all should participate in the voting for the termination. And the BIA said no, no, because you never resided and you never had a vested interest in the property. And so she was excluded. And then, of course, Mabel Dixie dies and the probate court issued an order vesting the interest of that property to her heirs, which included Yakima Dixie. So what we have is we have Yakima Dixie having a vested interest in the property, the authority to enroll, the authority to organize, and we have this leadership dispute that the BIA was trying to resolve. And they did so by forcing, trying to force the tribe to reorganize under the IRA. That is unlawful. And it's also inconsistent with BIA policy. Their policy is basically to allow these unorganized tribes to organize themselves if they have those members residing on the ranch era to do so, not people that never resided on the tribe. And that's part of the problem. Part of the problem that we have is this inconsistent historical analysis by Washburn. And then, of course, we have now Dixie's death. He died in December of 2012, which kind of moots the whole notion, the whole reason, the necessity of reorganizing the tribe under the IRA. That was the reason why, again, why the BIA was so focused on reorganizing the tribe, because they had this leadership dispute. Now that that's gone, there's no need to do that. So the issue is who is the tribe? Washburn never said that Dixie's act in enrolling the Burleys was unlawful or invalid. They are still enrolled members. And so we have these unenrolled members, these punitive members, potential members, of course, who can participate in membership of the tribe if they ask the general counsel. But we have this problem that Washburn says, well, I'm not going to acknowledge the general counsel. And so we have nothing. What do we have? And what standing do these followers of Dixie have in saying we want to reorganize the tribe? There's no reason for that. So we have a problem. Counsel, you're using up what you had wanted to save us for your bubble time. Did you still wish to save some time? I do. I want to save some time, Your Honor. Thank you. May it please the Court. Good morning, Your Honors. My name is John Smeltzer. I'm here for the Department of the Interior. Excuse me. Could I ask the clerk to put this as 15 minutes? There's separate timing for counsel for the United States and for the Dixie faction. Thank you. Thank you. And good morning again, Your Honors. We ask this Court to affirm the district court decision and to uphold the 2015 decision of the assistant secretary for two reasons. First, because the Dixie circuit has already ruled in Miwok II that Interior reasonably may decline to recognize the Burley family as a governing majority of the tribe, and that determination is binding on this Court as a matter of issue preclusion. But that's not the issue that the district court said was the preclusive issue, correct? The district court said that the preclusive issue was there was a necessary decision that the tribe consisted of more than five members, that that was the issue, correct? Well, I think it's just a narrower way of reframing the same issue that I just addressed. The ultimate issue in the case that the Court must decide and that's being argued is whether the department reasonably declined to recognize the Burley family as a governing majority of the tribe. And that depends on, you know, how many tribal members. You could say that depends on does the tribe have, you know, five members, four members, whatever. Well, counsel, the district court said the issue of how many tribe members there were was precluded. And in Miwok 1, for example, in footnote 8, the court said the only issue being decided is one of statutory interpretation. So how could, if the only issue being decided, as the court said, was statutory interpretation, how could the court have necessarily decided as a matter of fact that the tribe consisted of more than five members? Well, if you look at the ruling in Miwok 2 from the D.C. Circuit, where the court specifically says that the Burley family's attempt to organize was anti-majoritarian and the Burley family represented a tiny fraction of the tribal community and the potential eligible. Potentially eligible. I think here's the problem as I see it. It appears to me that Miwok 2 did in fact decide the issue and Miwok 3 described Miwok 2 incorrectly. And so when that happens, I guess the legal question is do we take Miwok 2 at its own face value or are we bound by a later misdescription of what Miwok 2 actually held? And I couldn't find any cases on that, but it seems to me that we take Miwok 2 as it comes and if another court just has interpreted it differently, it still exists as its own precedent. Yes, Judge Graber. We would agree with that view that the decision that was made in Miwok 3 with respect to the binding impact of Miwok 2 in this proceeding, I mean, it wasn't even before the court. I mean, what the court did in Miwok 3 was address the preclusive impact of Miwok 2 on the issues that were before the court in Miwok 3. Right? In Miwok 3 was a completely different posture. Getting back, counsel, to Miwok 2, the court said in Miwok 2, we hold that the Secretary's interpretation is a permissible one. Yes. And the district court here said Miwok 1 and Miwok 2 did decide the issue of whether the tribe consists of more than five members. Issue preclusion requires necessarily decided and actually decided more than five members. Can you point me to any specific language in either Miwok 1 or Miwok 2 where either court said as a matter of what was decided, the tribe does consist of more than five members as opposed to it potentially consists of more than five members? Specific language. Your Honor, the language in Miwok 2 is very specific in describing the efforts of the Burleigh family as anti-majoritarian and describing them as a tiny fraction of the tribal community. As we've explained in our brief, determining the actual number of members of a tribe is ultimately up to the tribal community as part of the organizational process. So there's sometimes confusion between the terms who is a member of the tribe and, you know, potential member. But ultimately the number But, counsel, the district court said at page 13 of the order, Miwok 1 and Miwok 2 did decide the issue of whether the tribe consists of more than five members. And I'm trying to, I'm asking you to identify where did they actually say that they did decide it because we're dealing here with the issue of preclusion. Right. And what I'm saying is the issue in this case is not how many members there are in the tribe. The issue is did the Department of Interior reasonably decline to accept the Burleigh family as a governing majority of the tribe? Ultimately, the issue as to how many members there are in the tribe is up to the tribe through the organization process. The question whether to accept that is then a deferential one with respect to the Department of the Interior. In Miwok 2, this court, the D.C. Circuit didn't decide the number of people in the tribe because the question before the court in Miwok 2 was could the Department of Interior reasonably decline to accept this group, this group of four Burleigh family members as a majority of the tribe because there was this broader tribal community. That's the exact same issue that's before the court today. Is that the ground the district court below relied on in granting the motion to dismiss on the basis of issue preclusion, what you just said? I think the district court analyzed issue preclusion slightly differently, Your Honor. And if that's an issue, then I guess we have a problem. But I understand issue preclusion to be a de novo question. And this court cannot possibly grant the relief that the Burleigh family is requesting without deciding exactly opposite what the D.C. Circuit held, which was the Department of Interior reasonably declined to accept the Burleigh family as a majority, as a governing majority for purposes of operating the Miwok tribe. I think what's difficult is the sort of line drawing exercise because the tribe is entitled to set its own membership criteria ultimately and decide who's a member. And yet the secretary has the obligation to make sure that that process is done by respecting a majority. So they're kind of conflicting policies, and that makes it sort of difficult to analyze in any given situation. Yeah, I would agree, Your Honor. And I don't want to get caught up in the question of issue preclusion if this court has difficulties with it because the issue as to whether the determination was reasonable is not a difficult issue. It was an issue that's essentially been decided, but if this court determines that it needs to look at that issue afresh, this court shouldn't have any difficulty with that issue because the Burleigh family has not identified any law, any regulation, or any precedent which supports their view that the 2015 decision is unreasonable or contrary to law. Their argument is that it's not. I understand it because it's inconsistent with the historical facts. That seems to be the essence of the argument as I understand it. What is your response to that? Well, they misinterpret the historical facts and the law that governs those facts. They begin with this predicate assumption that because Yakima Dixie was the lone member exclusive authority to organize the tribe and to enroll other members, and there's no statute, there's no regulation, and there's no precedent that establishes that. They point to the Indian Reorganization Act, Section 18 of that act provided for opt-out elections, and the specific language of that provision just said that what the Department of Interior was to do was to go to reservations and then take a vote among the residents within the reservations for the limited purpose of determining whether those communities were to opt out of the IRA. And so you had small reservations, you had large reservations. What the Bureau did at the time was to go to the reservations and just take an election of the folks on the reservation. But as counsel acknowledged, the population of the tribe at the time, the Miwok tribe, was deemed to be 16. So there's a difference between complying with Section 18, which is a limited provision, just talking about opting out and not organizing, and the issue of who has the authority to organize. And the statute certainly doesn't say, pursuant to Section 16 in organization or organizations generally by a tribe, that somehow the creation of a reservation and who lives on the reservation provides the authority to organize. Counsel, when the matter was remanded for the Secretary's decision, the Washburn decision, did the Secretary have the authority to determine how many members were – had the authority to determine whether the tribe was limited to five members? That authority was clearly there, correct? Well, they had the authority to determine that issue in that context, which is – were these – was it proper to recognize these five people as the only members of the tribe? And the Washburn letter says, all of the federal court decisions examining the dispute make clear that the tribe is not limited to five individuals. If we find that that was the basis for the decision and that that reading of the court decisions was incorrect, do we need to order this case remanded for a new decision as to the issues here as to whether the tribe is limited to five people if we determine that as a matter of law that reading of the court decisions was wrong, or can we still affirm on the ground that it wasn't arbitrary and capricious? Your Honor, you can still affirm. That wasn't – there's no indication that the Secretary – Assistant Secretary Washburn was saying that he was bound by these prior decisions. He obviously issued his own decision, his own determination, and that determination was consistent with every determination that BIA had made between that March 2004 letter that was mentioned and the 2015 determination except for the Echo Hawk determination in 2011. BIA and DOI have consistently, from 2004 to today, except for the Echo Hawk decision, has taken the view that for the proper organization of this tribe is pursuant to the broader tribal community. Well, there is also, in addition to talking about those three cases at ER 894 and 95 and following, the 2015 decision goes on to discuss its own interpretation of the historical evidence and who is potentially eligible as a member of the tribe. Is that recounting a permissible recounting in your view of the history? Yes, Your Honor. I think I understood the question to be was there a mistake of law, you know, in the 2015 decision that somehow if the court found that the Assistant Secretary had misread prior law, that there might need to be a remand. And what I suggest is that if you look at the decision overall, the Assistant Secretary was under no view that he was bound by the prior cases. He issued his own analysis that was consistent with the previous analysis and consistent with the facts. So you believe that when the Secretary said, I conclude that the tribe's membership is not properly limited to Mr. Dixie in the Burley fashion at 894, that that is unaffected by any possible legal error? No, I don't believe there was any legal error. I'm not sure which legal error you're referring to. Any possible legal error in misreading the prior cases. Your view is that that conclusion stands alone and should be affirmed. I didn't understand the Assistant Secretary to be saying simply I am bound by this prior precedent. If the Assistant Secretary had believed that, I don't believe he would have needed to issue, you know, the decision in the full regard. And so for that reason, there's no reason to remand it to determine whether the Assistant Secretary would adopt the same analysis, you know, Ultimately, I want to come back to this question of the authority based on reservation residents. And historically what happened, again, from the beginning, we know that there were some 13 or 16, depending on the time frame, members or persons who were part of the tribe that was recognized at that time when the Indian agents went out pursuant to their authority to purchase land, that there was a band there for whom they needed to provide some assistance. And what the Burley family would have this court find is because the Department of Interior purchased a one-acre rancheria that was too small to be a permanent homeland for this tribe, that somehow that act of purchasing that small rancheria required all the members to move on to that rancheria if they wanted to organize. And there's just no, that would be anathema to the notion of tribal sovereignty, that we can eliminate a tribe by buying a small piece of land. And there was nothing in the statute that authorized the purchase of that land that would provide that result. There's nothing in the Indian Reorganization Act that would suggest that result. There's nothing in precedent that would suggest that result. The policy of the Department of Interior has always been in helping tribes to organize is to start with the base role and to look to descendants of the broader tribal community and then look to whether, when the tribe organizes, whether they have done so consistent with the general rights of that broader tribal community. My time is up. We'll hear from Mr. Rusk, who should have five minutes on the clock. Thank you. Thank you. May it please the Court, James Rusk, representing the Appellees California Valley Miwok Tribe and its Tribal Council. I'd like to start by clarifying membership versus organization. In some cases, the prior court cases have been a little unclear about those two concepts. But the 2015 decision here, it found that the tribe's membership was not properly limited to five people. It did not purport to define the tribe's membership. It then went on to say that there is a larger group of people, the eligible groups, who are lineal descendants of known members, who are eligible to participate in the initial organization of the tribe, which is the adoption of a tribal governing document, formation of a government, and among other things, defining criteria for membership in the tribe. That's how the membership actually gets defined. So it would probably be more accurate to say of Miwok I and II that what they necessarily decided was that participation in tribal organization was not properly limited to five people and, therefore, that the efforts to create a government and define the tribe's membership by the Burley Group back in 1998, et cetera, were not effective. But that's not what the district court said, correct? Correct. The district court said Miwok I and II did decide the issue of whether the tribe consists of more than five members. So are you saying that the district court was wrong in that finding? No, Your Honor. I think he was focused on the concept which correlates to what was expressed in the 2015 decision that the membership could not be properly limited to five people. So, in other words, Miwok I and II did not make an explicit determination about how many members there are or who they were, but they acknowledged there is a larger tribal community entitled to participate in organization, which will define the membership, and, therefore, that these efforts to define and limit the membership to five people were not effective and can't be recognized. So do I correctly understand your argument to be that there is issue preclusion, but described in a more nuanced way than the district court described it below? Yes, Your Honor. Is that your argument? Yes, Your Honor. Okay. Although, again, in Miwok I, the court said in footnote 8, the only issue being decided is one of statutory interpretation. So if the court described what it was doing was I'm only deciding statutory interpretation, how could the court have necessarily decided that the members eligible to organize consisted of five in terms of issue preclusion? How could the Miwok II? No, I'm talking about Miwok I. Miwok I, which is what Miwok II affirmed, says all I am deciding here is statutory interpretation. Yes, Your Honor, and the question is how could he have decided that there were more than five people? Yes, how could it, for issue preclusion purposes, how could that include the necessary and actually decided finding of there are more than five people eligible when he said all I'm deciding is an issue of statutory interpretation? So the statutory issue that he decided was that what was then 476H of the IRA did not eliminate the majoritarian requirements of the IRA, that the whole tribal community had to be involved. It was still necessary to his decision that the two people who signed the 1998 resolution were not a And to determine that, I think he relied, among other things, on the Burleys' own statements that the tribal community was thought to number about 250 people, as well as the evidence in the record and the BIA's statements in that case, which included deposition testimony from BIA official Brian Golding, who said that the BIA had remained in touch with this tribe, that they knew it to be a community of Miwok Indians living in and around Sheep Ranch, et cetera. So there was, and I don't think that the Burleys ever disputed that these people existed. They simply denied their legal status, and that's what they continue to do today. They do not deny the evidence in the record. And if I could briefly, you asked a question about is there a basis to uphold the decision, even if the Assistant Secretary was mistaken about the effect of the prior decisions. There is ample evidence in the record that the tribal community, these lineal descendants of historical tribal members, were a number far more than five and are known to the BIA. And this is addressed in pages 45 to 46 of our brief. But among other things ---- Well, the decision itself says, I find that for purposes of reorganization, the tribe's membership would be properly drawn from, and then he goes on for a very long time, about what specifically he finds. Yes, Your Honor. And that, as Mr. Schmelzer said, that finding about who the known members of the tribe are and the fact that their lineal descendants are entitled to participate in the organization is fully consistent with the BIA's past practice with the Ion Band of Miwoks, the Tejon tribe, and various other tribes. On the other hand, Mr. Corrales' theory is totally novel. The only precedent he, I use that word in scare quotes, he offers for it is a consent decree in a settlement in the Hardwick case to which this tribe was not a party. So he's got otherwise absolutely no authority for the proposition that the BIA ever did or even could limit membership or participation in tribal organization to residents of Aran Sharia. And as we said in our brief, the BIA does not even have that authority. That would violate the law. Thank you, counsel. Thank you, Your Honor. Mr. Corrales, you have reserved a bit of rebuttal time. Thank you, Your Honor. Going backwards, counsel just said that there's no evidence that the BIA ever limited participation in organizations of these Aran Sharias to those people who actually resided on the tribe. And I pointed that out to the court in my opening argument, that look at ER-44 and ER-393 and so forth. These two documents, the tabulation that came up with the 16 for the Miwok tribe and the 103 for the Stewart's Ranch area, 20 for Rumsey Ranch area, and Susanville Ranch area, 24, but that the eligible voters from this document ER-44 were, Jeff Davis has listed as the only one eligible to vote. And keep in mind, voting for what? For the ERA, which is to organize the tribe. And then 70 for Stewart's, 11 for Rumsey, 9 for Susanville Ranch area. Half of the population that was tabulated were eligible to vote. So when we say, did Dixie have the authority to organize the tribe after he enrolled the Burleys in 1998 to the exclusion of the descendants of the 1915 census? Yes, he did, according to BIA policy. That's what he did. So there was nothing wrong about that. So the issue, going back to issue preclusion, the issue here was not before any court before today. In organizing the tribe in 1998, whether the Burleys and the Dixies constituted the majority, but what constitutes the majority of the tribe? What constitutes the tribe? Was it Dixie and his brother and the Burleys, or was it them plus the descendants of the 1915 census, this 200 and so, who never resided on the property? That issue, whether or not they resided on the property to be potential members, to be these punitive members, to be able to participate in the organization of the tribe, was never decided in Miwok I or II. Miwok I was about the interpretation of 474H, and Miwok II said, yeah, that was a fair interpretation. But no one was talking about whether or not there were punitive members. These majority of members, so-called members, were members because they either did or did not reside on the property, in accordance with BIA policy. So these issues were never previously decided. The other point that he makes here is about moving onto the land. It's too small, and that's not my, I'm not pitching that at all. This opportunity that John Turrell gave the band of Indians in 1916 when he purchased the property  It was during the assimilation period when the government was trying to make Indians farmers. So they wanted them to have a place to live so they can go down a couple of miles or so to farm and to live on the property and use it. Peter Hodge, who was the band leader, he had his own property, 160 acres a couple of miles away. He didn't need to live on the property. So this idea about everybody squeezing onto the property, that's nonsense. I'm not arguing that. In fact, Washburn tries to say, well, it's those people that were not residents of the property but had some sort of a, he called it an assignment, a potential assignment, because the government would give them assignments to use the property. There was never an assignment in this case. There was never an allotment in this case. All we have is just a pure piece of land. And the problem that other ranch areas did not enjoy, if you want to call them problems, it was never terminated. Counsel? Yes. You've exceeded your allotted time. I'm sorry. There's too much here to say, but thank you very much, Your Honor. Thank you. The case just argued is submitted, and we appreciate the arguments of all participating counsel.
judges: Thacker, Graber, Bennett